ACCEPTED
06-15-00136-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
12/30/2015 1:12:03 PM
DEBBIE AUTREY
CLERK

## NO. 06-15-00136-CR

**IN THE COURT OF APPEALS FOR
THE SIXTH COURT OF APPEALS DISTRICT
TEXARKANA, TEXAS**

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
12/30/2015 1:12:03 PM
DEBBIE AUTREY
Clerk

# BRONCHEA GERAD WALKER,

## Appellant

## v.

# THE STATE OF TEXAS,

## Appellee

## APPELLANT'S BRIEF

On Appeal from the 19th District Court
of McLennan County, Texas,
Trial Court Cause No. 2013-1937-C1

**E. Alan Bennett**
State Bar #02140700
Attorney for Appellant

Sheehy, Lovelace & Mayfield, P.C.
510 N. Valley Mills Dr., Ste. 500
Waco, Texas  76710
Telephone:  (254) 772-8022
Telecopier:  (254) 772-9297
Email:  abennett@slmpc.com

# Identity of Parties and Counsel

Appellant, pursuant to Rule of Appellate Procedure 38.1(a), provides the following list of all parties to the trial court's judgment and the names and addresses of all trial and appellate counsel.

**THE DEFENSE:**

| | |
|---|---|
| Bronchea Gerad Walker | Appellant |
| E. Alan Bennett<br>Sheehy, Lovelace & Mayfield, PC<br>510 North Valley Mills Drive, Suite 500<br>Waco, Texas 76710 | Trial and<br>Appellate Counsel |

**THE PROSECUTION:**

| | |
|---|---|
| Hilary Laborde<br>Evan O'Donnell<br>Assistant Criminal District Attorneys | Trial Counsel |
| Sterling Harmon<br>Assistant Criminal District Attorney | Appellate Counsel |

Abelino Reyna
Criminal District Attorney
McLennan County
219 North Sixth Street, Suite 200
Waco, Texas 76701

# Table of Contents

Identity of Parties and Counsel..............................................................................2

Table of Contents ....................................................................................................3

Index of Authorities................................................................................................5

Statement of the Case .............................................................................................8

Statement Regarding Oral Argument...................................................................8

Issues Presented ......................................................................................................9

Statement of Facts .................................................................................................10

Summary of the Argument..................................................................................22

Argument ...............................................................................................................23

  First Issue: The evidence is insufficient to corroborate the accomplices' testimony. ...............................................................................................23

    A. An Accomplice's Testimony Must Be Corroborated. .......................23
    B. Examples From Similar Cases Connected the Defendant to the Robbery. .....................................................................................................25
    C. The Other Evidence Does Not Provide Sufficient Corroboration. 26
    D. Summary........................................................................................................27

Second Issue: The trial court abused its discretion by admitting text messages found on an accomplice's phone. ..................................................29

    A.    Issues of Admissibility Are Reviewed Under an Abuse-of-Discretion Standard..................................................................29
    B.    The Text Messages Are Inadmissible Hearsay Evidence.................29
    C.    The State Failed to Connect the Text Messages to Walker. ............31
    D.    Walker's Testimony Did Not Waive the Error. ..............................32
    E.    The Court Abused Its Discretion by Admitting the Text Messages.. ..................................................................................................33
    F.    Walker Was Harmed by This Error...................................................34


Prayer ................................................................................................................37

Certificate of Compliance ..............................................................................38

Certificate of Service .......................................................................................38

# Index of Authorities

## Federal Cases

*Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) ........................................................................................................................36

*Kotteakos v. United States*, 328 U.S. 750, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946) 36

*O'Neal v. McAninch*, 513 U.S. 432, 115 S. Ct. 992, 130 L. Ed. 2d 947 (1995) ...36

## Texas Cases

*Barshaw v. State*, 342 S.W.3d 91 (Tex. Crim. App. 2011) ...................................35

*Biera v. State*, 280 S.W.3d 388 (Tex. App.—Amarillo 2008, pet. ref'd) ...........24

*Black v. State*, 358 S.W.3d 823 (Tex. App.—Fort Worth 2012, pet. ref'd) 30, 33

*Brown v. State*, 189 S.W.3d 382 (Tex. App.—Texarkana 2006, pet. ref'd) 34, 36

*Burnett v. State*, 88 S.W.3d 633 (Tex. Crim. App. 2002) .....................................35

*Butler v. State*, 459 S.W.3d 595 (Tex. Crim. App. 2015) ............................. 31, 33

*Castillo v. State*, 221 S.W.3d 689 (Tex. Crim. App. 2007) ........................... 23, 24

*Chapman v. State*, 470 S.W.2d 656 (Tex. Crim. App. 1971) ...............................24

*Cocke v. State*, 201 S.W.3d 744 (Tex. Crim. App. 2006) ........................ 25, 31, 33

*Freeman v. State*, 352 S.W.3d 77 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) ......................................................................................................................24

*Gaston v. State*, 324 S.W.3d 905 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) ............................................................................................................. 26, 27, 28

*Golden v. State*, 851 S.W.2d 291 (Tex. Crim. App. 1993) ...................................24

*Hernandez v. State*, 454 S.W.3d 643 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) ............................................................................................25

*Leday v. State*, 983 S.W.2d 713 (Tex. Crim. App. 1998) .............................. 32, 34

*Long v. State*, 39 Tex. Crim. 537, 47 S.W. 363 (1898) .......................................27

*Malik v. State*, 953 S.W.3d 234 (Tex. Crim. App. 1997) ............................. 24, 28

*Martinez v. State*, 188 S.W.3d 291 (Tex. App.—Waco 2006, pet. ref'd) ... 35, 36

*McGlothlin v. State*, 896 S.W.2d 183 (Tex. Crim. App. 1995) ..................... 32, 34

*Nelson v. State*, 542 S.W.2d 175 (Tex. Crim. App. 1976) ..................................27

*Rios v. State*, 982 S.W.2d 558 (Tex. App.—San Antonio 1998, pet. ref'd) ......24

*Schnidt v. State*, 357 S.W.3d 845 (Tex. App.—Eastland 2012, pet. ref'd)  25, 26

*Schutz v. State*, 63 S.W.3d 442 (Tex. Crim. App. 2001) ....................................35

*Tienda v. State*, 358 S.W.3d 633 (Tex. Crim. App. 2012) ..................................31

*Tillman v. State*, 354 S.W.3d 425 (Tex. Crim. App. 2011) .................................29

*Webster v. State*, 26 S.W.3d 717 (Tex. App.—Waco 2000, pet. ref'd) ....... 32, 34

*Wincott v. State*, 59 S.W.3d 691 (Tex. App.—Austin 2001, pet. ref'd) ..... 27, 28

*Winfrey v. State*, 393 S.W.3d 763 (Tex. Crim. App. 2013) ................................24

## Texas Statutes

TEX. CODE CRIM. PROC. art. 38.14 ........................................................ 23, 31, 33

## Rules

TEX. R. APP. P. 41.3 ...........................................................................................8

TEX. R. APP. P. 43.2 .........................................................................................36

TEX. R. APP. P. 44.2 .........................................................................................34

TEX. R. EVID. 801(d) .......................................................................................30

## Treatises

43 GEORGE E. DIX. & JOHN M. SCHMOLESKY, TEXAS PRACTICE SERIES: CRIMINAL PRACTICE AND PROCEDURE § 43:5 (3d ed. 2011)...................................................32

## Statement of the Case

A jury convicted Bronchea Gerad Walker of aggravated robbery. (CR 59), (4 RR 171) The jury assessed his punishment at twenty-three years' imprisonment. (CR 70), (5 RR 107) The trial court, the Honorable Ralph T. Strother, judge of the 19th District Court of McLennan County, sentenced Walker in accordance with the verdict. (CR 72-73), (5 RR 107-08) Walker timely filed a notice of appeal in the Waco Court of Appeals. (CR 78) Under a docket equalization order, the appeal was transferred to this Court.[1]

## Statement Regarding Oral Argument

Oral argument will not aid the Court's decisional process in this appeal.

---

[1] In accordance with Rule 41.3, this appeal should be decided in accordance with the precedent of the Waco Court of Appeals to the extent applicable. TEX. R. APP. P. 41.3. Accordingly, counsel provides citations to relevant decisions of the Waco Court (and of this Court) when available.

# Issues Presented

First Issue:    The evidence is insufficient to corroborate the accomplices' testimony.

Second Issue:    The trial court abused its discretion by admitting text messages found on an accomplice's phone.

## Statement of Facts

*The Testimony*

Edgar Llorens owns Eddie's Tire Shop.[2] (3 RR 13-14) On the occasion in question, he had several security cameras at this business. (3 RR 15-16) He installed them in response to a series of robberies and forgeries. (3 RR 17-18)

Llorens explained that men came and held him at gunpoint around 8:00 that morning. (3 RR 22) He allowed them to take a few hundred dollars that were in his pocket.[3] (3 RR 22-23) One of the men searched the desk in Llorens's office and took a camera and a radar detector. (3 RR 23) The State then published a video recording marked as State's Exhibit 1 (which had been admitted without objection) to the jury. (3 RR 19, 24)

After the State played the recording from Camera 1,[4] Llorens explained that the men arrived at around 8:03 and had left by 8:04:18. He then went outside and called the police. (3 RR 25) The State then played the recording from Camera 2. (3 RR 25-26) Llorens testified that all three men

---

[2]  Llorens also operates a check cashing service at this location. (3 RR 14)

[3]  Llorens wisely did not volunteer that he had additional money in a safe. (3 RR 23)

[4]  State's Exhibit 1 includes recordings from Llorens's Cameras 1, 2, 7 and 8. (3 RR 24)

had guns. (3 RR 26) One of them shoved him after Llorens said he did not have any money other than the money in his pocket. (3 RR 26-27) This man had a white t-shirt and a black ski mask. (3 RR 27) Llorens later testified that this man put a "gun in my face." (3 RR 30)

The State then played the recording from Camera 7 which is a view of the street behind the business. (3 RR 27-28) This camera recorded a white automobile parked near the business as the three men were inside. Then the men are seen leaving the premises, getting in the car and driving away. (3 RR 28) The recording from Camera 8 also provides an outside view. (3 RR 29) The second man was wearing a cap and bandana around his face. (3 RR 30)

Because the men's faces were covered, Llorens could not identify any of them. (3 RR 31) He explained that his only thought at the moment was concern for his safety. (3 RR 32)

On cross-examination, Llorens testified that the only investigation conducted by the police at his premises was to collect the video evidence and his written statement. They did not return with a photo spread or to collect other evidence like fingerprints. (3 RR 34)

Walker's co-defendant Oliver Johnson testified that Walker approached him with the idea "to rob a check cashing place." (3 RR 37-38) He claimed that Walker only needed him to provide transportation. Johnson did not have a car at that time but later borrowed his brother's car. Johnson claims he contacted Walker at that point and "[Walker] planned the robbery from there." (3 RR 38)

According to Johnson, when they arrived at the location, Walker told him to drive behind the business. After the three men got out of the car, Walker told him to make a U-turn and then wait for them. (3 RR 38) The men then returned to the car, and Johnson drove away. Johnson testified that as he was driving he looked back and saw a gun in "his lap." Then "we dropped him off." (3 RR 39)

Johnson and Willie Clark then went to enroll at Texas State Technical College before returning to Johnson's house. Later, some detectives walked into the yard after recognizing the car that had been involved in the robbery. (3 RR 39) After questioning, Johnson accompanied them to the station for an interview before being arrested. (3 RR 39-40)

In a hearing outside the jury's presence, the State introduced copies of text messages purportedly exchanged between Johnson and Walker. (3 RR

42-43), (SX 8-18) Defense counsel re-urged a hearsay objection to the content of the text messages and secured a running objection. (3 RR 42) Before the jury, the court admitted the text messages over counsel's running objection. (3 RR 46)

According to Johnson, the text messages depicted an exchange between Walker and himself in which Johnson offered to get a vehicle for some unspecified activity. This exchange occurred on August 9, 2013. (3 RR 46-47), (SX 8) In a later text exchange, Johnson expressed reluctance to participate if he were to "come out empty handed." (3 RR 47-48), (SX 9) Later, Walker purportedly texted Johnson to express concern about whether Walker could trust a participant recruited by Johnson whom Walker did not know. (3 RR 48-49), (SX 10)

Early on the morning of August 14, they purportedly exchanged text messages in which Walker confirmed it was "a Fasho thing" and asked, "You gt it trap? Already." According to Johnson, Walker was asking "was we on for tomorrow?" (3 RR 50), (SX 13) Johnson later texted Walker and said he wanted to come get Walker. Walker replied that he needed to wait until 6:45 after Walker's mother left. (3 RR 50-51), (SX 14) State's Exhibits 15

to 18 were lists of the text messages purportedly exchanged between them. (3 RR 51-52), (SX 15-18)

Johnson got $15 or $30 out of the robbery. (3 RR 52) Willie Clark volunteered to participate. (3 RR 53)

On cross-examination, Johnson conceded that he had five prior convictions for burglary of a vehicle. He cooperated with the police in the hope they would not arrest him. (3 RR 54) He admitted that he was hoping for a better plea bargain in exchange for his testimony. (3 RR 54-55) He testified that he picked Walker up at his mother's house before the robbery, but he told the police that he picked him up at an apartment complex. (3 RR 55) Thus, he admitted that he lied to the police. (3 RR 56)

Walker's other co-defendant Willie Clark has known Oliver Johnson since Eighth Grade. He has known Walker since middle school. The three of them also attended Waco High together. (3 RR 60) Clark received a call the morning of the robbery. He agreed to participate because they were supposed to collected "a large amount of money" and he had just lost his job. (3 RR 61) He admitted that he had two prior convictions for burglary of a vehicle. (3 RR 62)

Clark went into the tire shop during the robbery. Clark testified that, when he entered, Walker was already holding Llorens at gunpoint. Clark started rummaging through a desk and a filing cabinet. He got a couple of cameras but dropped them when he fled the scene. (3 RR 63) So basically, he came away empty-handed. (3 RR 63-64) Clark claimed that he thought it was going to be a mere robbery. "I didn't expect it to be an aggravated robbery." According to Clark, he did not know there were any weapons involved until he entered the shop. (3 RR 65)

Clark testified that, after the robbery, they dropped off Walker; went by a gas station; went to McLennan Community College for Johnson to register; went to TSTC for Clark to register; and then returned to Johnson's mother's house. (3 RR 67) When the police arrived, Clark's initial thought was to flee, but there were too many officers. He initially denied involvement until they found him in possession of the scarf. (3 RR 68)

Clark was not given any kind of deal in exchange for his testimony. (3 RR 72)

On cross-examination, Clark insisted that he brought a mask for the robbery but did not anticipate the use of firearms. (3 RR 75-76) He took orders from Walker even though he was barely his acquaintance. (3 RR 77)

He insisted that he had no expectations that he would receive anything in exchange for his testimony. (3 RR 77)

Sergeant Mike Miller of the Bellmead Police Department responded to the dispatch for the robbery along with other officers. (4 RR 8) Because of prior dealings with Llorens, they first obtained access to his video surveillance equipment. (4 RR 8-9) From this, they got a clear description of the car used by the robbers and broadcast that information. Because of Miller's knowledgeability regarding automobiles, he was able to identify the car as a Buick Roadmaster. (4 RR 9) Miller and Detective Haywood Sawyer drove around the Waco area looking for the car and eventually found it in the City of Waco. (4 RR 10) They contacted Waco Police because it was in their jurisdiction. Then they approached the house and made contact with the occupants of the car. Sawyer and Miller talked to them separately. (4 RR 12) After Sawyer spoke to Johnson, he came and took Clark into custody. (4 RR 13)

They transported the suspects to the Bellmead Police Department and interrogated them. (4 RR 14-15) During the interrogation, Clark told the officers that Walker was the first person who walked into the tire shop. Clark and Johnson referred to Walker as Bshay. (4 RR 17)

They also searched the car. The State offered a series of photographs of the exterior and interior of the car. (4 RR 15-16), (SX 20) They lifted fingerprints during the search of the car but were unable to match the prints to any particular person. (4 RR 18) They also recovered a cellphone from the car. (4 RR 20) They presented a photo lineup to Clark and Johnson, and both identified Walker. (4 RR 20-23), (SX 22)

On cross-examination, Miller conceded that Clark lied to the officers about his involvement. (4 RR 27) The officers never presented a photo lineup to Mr. Llorens to see if he could identify any of the robbers. (4 RR 28) When they arrested Walker, they did not find a mask or handgun or anything else that would connect him to the robbery. (4 RR 28-29)

Detective Sawyer testified that they spotted Clark and Johnson in the Buick around 1:30 that afternoon. (4 RR 35) Johnson did not use his cell phone again after the officers began talking with him, and the officers ultimately took possession of the phone along with other evidence. (4 RR 35-36) In an attempt to locate the other participants, Sawyer used Johnson's phone and sent two text messages to the number assigned to "Bshay":

- "WHO is that nuggah with you this morning"

- "Bshay way"

(4 RR 37), (SX 14)

Sawyer searched for that number on Facebook and came to Walker's Facebook page. (4 RR 48-49) He obtained Walker's identifying information and requested a photo lineup from the sheriff's department. (4 RR 49) Miller and Sawyer showed the lineup to Clark and Johnson. (4 RR 49-50) Sawyer showed the lineup to Clark, who identified Walker. (4 RR 50-51), (SX 21)

On cross-examination, Sawyer conceded that no physical evidence recovered from the car connected Walker to the crime. (4 RR 53-54) When they searched Walker's home, they likewise found no evidence connecting him to the crime. (4 RR 55-56) The officers never presented Mr. Llorens with a photo lineup. (4 RR 58)

The State rested after Sawyer's testimony. (4 RR 64)

The defense began with Walker's mother Carol Irvin. (4 RR 65) He lived in her home at the time of the robbery. His sister and her children also lived there. Irvin worked for the American Armed Forces Exchange Services distribution center. She worked from 7:00 to 3:30. (4 RR 66) Her typical schedule called for her to awaken at 5:45 and leave for work at 6:40 (4 RR 67) On the morning of the robbery, Walker was asleep in his bed facing the wall

when she left for work. In fact, he was snoring. Because he was unemployed at the time, Walker took care of his nephews during the day while his mother and sister both went to work. (4 RR 68)

Walker's sister Lenora testified that her sons were about to turn 7 and 3 at the time of the robbery. (4 RR 84) She worked then at Bush's Chicken on 19th Street, about a half-mile from the house. (4 RR 84-85) She awakened around 7:30 that morning for her shift that began at 8:00. (4 RR 85) Walker was there when she left for work at 7:55. He was responsible for watching her children while she was at work. (4 RR 87)

Bronchea Walker testified in his own defense. Johnson and he knew each other from church and school and had known each other seven or eight years. (4 RR 97) Walker testified about the text messages offered in evidence by the State. He explained that a message in which Johnson texted "I need some $$$ too" referred to a time when Johnson was unemployed. (4 RR 98) Walker was involved in selling marijuana so he thought they could pool their resources, sell some marijuana and make some money together. (4 RR 99-100) Walker asked Johnson to find them a ride to go get the marijuana. (4 RR 101-02) The messages between them on August 9 referred to a trap. (4 RR

102) Walker explained that the term "trap" refers to "a house where people go to buy and sell drugs." (4 RR 102-03)

On the morning of August 14, Johnson texted Walker to say he had some money so they could get some marijuana to resell. (4 RR 103) In reviewing other text messages exchanged between them that morning, Walker explained that he was sleeping and texting intermittently. (4 RR 104-05) About 7:00 that morning, Walker and Johnson talked on the phone. Johnson said he could not find a car, so they called off the marijuana plans.[5] (4 RR 106)

Walker thinks Clark and Johnson are trying to set him up because of a prior conflict between them and some friends of his. (4 RR 107)

*The Trial Proceedings*

The indictment alleges that on or about August 14, 2013 Walker did, "while in the course of committing theft of property and with intent to obtain or maintain control of said property, intentionally or knowingly threaten or place EDGAR LLORENS in fear of imminent bodily injury or death, and the

---

[5] Walker planned to have his brother come over and watch his nephews for about 20 minutes or so if they had followed through with these plans. (4 RR 106)

Defendant did then and there use or exhibit a deadly weapon, to-wit: a firearm." (CR 5)

The jury deliberated for about two hours before returning a guilty verdict. (CR 50, 59), (4 RR 168)

*The Punishment Phase*

Walker called several friends and family members as punishment witnesses and to establish his eligibility for community supervision. (5 RR 5-69)

The jury assessed Walker's punishment at twenty-three years' imprisonment. (CR 70), (5 RR 107)

The trial court sentenced Walker in accordance with the verdict. (CR 72-73), (5 RR 107-08)

## Summary of the Argument

Because the State also indicted Oliver Johnson and Willie Clark for the robbery, they were accomplices as a matter of law. Accordingly, the State had to offer evidence to corroborate their testimony. However, the record contains no corroborating evidence. Thus, the evidence is insufficient to support Walker's conviction.

Oliver Johnson identified a series of text messages that he claims were exchanged between Walker and himself. The messages were not properly authenticated and constituted inadmissible hearsay because the State presented no evidence connecting them to Walker's phone.

# Argument

**First Issue:** **The evidence is insufficient to corroborate the accomplices' testimony.**

Because the State also indicted Oliver Johnson and Willie Clark for the robbery, they were accomplices as a matter of law. Accordingly, the State had to offer evidence to corroborate their testimony. However, the record contains no corroborating evidence. Thus, the evidence is insufficient to support Walker's conviction.

## A. An Accomplice's Testimony Must Be Corroborated.

Article 38.14 of the Code of Criminal Procedure defines the accomplice-witness rule.

> A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

TEX. CODE CRIM. PROC. art. 38.14.

Under the accomplice-witness rule, an appellate court disregards the accomplice testimony and then examines the remainder of the record for any evidence that tends to connect the defendant with the commission of the offense. *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). The

corroborating evidence does not need to suffice standing alone to prove guilt beyond a reasonable doubt. It does not even need to directly link the defendant to the offense. *Id.*

Mere presence with an accomplice at or near the time of an offense does not, standing alone, provide sufficient corroboration. *See Golden v. State*, 851 S.W.2d 291, 294 (Tex. Crim. App. 1993); *Freeman v. State*, 352 S.W.3d 77, 84 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd); *Rios v. State*, 982 S.W.2d 558, 560 (Tex. App.—San Antonio 1998, pet. ref'd).

The testimony of one accomplice may not be relied on to corroborate the testimony of another accomplice. *Chapman v. State*, 470 S.W.2d 656, 660 (Tex. Crim. App. 1971); *Biera v. State*, 280 S.W.3d 388, 395 (Tex. App.—Amarillo 2008, pet. ref'd). Rather, there must be independent, non-accomplice corroborating evidence.

This statutory analysis is not the same as the constitutionally-mandated evidentiary-sufficiency analysis of *Jackson v. Virginia*. *See Winfrey v. State*, 393 S.W.3d 763, 770 (Tex. Crim. App. 2013). However, the failure of the State to adequately corroborate an accomplice's testimony requires reversal and rendition of a judgment of acquittal. *Malik v. State*, 953 S.W.3d 234, 240 n.6 (Tex. Crim. App. 1997).

Here, Johnson and Clark were accomplices as a matter of law so their testimony had to be corroborated. [6] However, the State failed to do so.

## B. Examples From Similar Cases Connected the Defendant to the Robbery.

In other cases, courts have found sufficient corroboration when the non-accomplice evidence actually connected the defendant to the robbery. Here, the State offered no such evidence.

For example, in *Hernandez v. State*, 454 S.W.3d 643 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd), the victim of the robbery identified the defendant in a live line-up and at trial "as the man who put a gun to her head and robbed her." *Id.* at 648. This eyewitness identification was sufficient to corroborate the accomplice testimony. *Id.* In Walker's case, however, the victim was not able to identify any of the robbers.

Or in *Schnidt v. State*, 357 S.W.3d 845 (Tex. App.—Eastland 2012, pet. ref'd), the defendant used a credit card stolen in the robbery the next day and thus had recent possession of stolen property. *Id.* at 851. This was

---

[6] Because Johnson and Clark were under indictment for the same aggravated robbery, they were accomplices as a matter of law. *See Cocke v. State*, 201 S.W.3d 744, 747-48 (Tex. Crim. App. 2006).

sufficient evidence to corroborate the accomplice testimony. *Id.* In Walker's case, however, he was not found to be in possession of anything stolen in the robbery.

## C.    The Other Evidence Does Not Provide Sufficient Corroboration.

The remaining non-accomplice evidence does not tend to connect Walker to the offense. The evidence offered by the State consisted of: (1) the testimony of the complainant Mr. Llorens; (2) video recordings of the robbery; (3) the testimony of the accomplices, Johnson and Clark; (4) the text messages; and (5) the testimony of the investigating officers.

Mr. Llorens could not identify Walker (or anyone) as one of the offenders.

The video recordings depicting a masked robber do not tend to connect Walker to the offense. *See Gaston v. State*, 324 S.W.3d 905, 911 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (video depicting masked robber with no "distinguishing marks or characteristics of the offender" insufficient to connect defendant to robbery).

Johnson's and Clark's accomplice testimony cannot be considered.

The text messages do not corroborate their accomplice testimony for two reasons. First, the messages are inadmissible for the reasons stated in the Second Issue. Inadmissible evidence cannot be relied on to corroborate accomplice testimony. *Long v. State*, 39 Tex. Crim. 537, 47 S.W. 363, 364 (1898). And second, the messages at most arguably connect Walker to Johnson, but not to the commission of the offense. *See Wincott v. State*, 59 S.W.3d 691, 698 (Tex. App.—Austin 2001, pet. ref'd) ("The mere presence of the accused in the company of the accomplice ... shortly before or after the time of the offense is not, in itself, sufficient corroboration of the testimony of the accomplice.") (quoting *Nelson v. State*, 542 S.W.2d 175, 177 (Tex. Crim. App. 1976)); *accord Gaston*, 324 S.W.3d at 911.

Finally, the investigating officers testified that they uncovered no physical evidence connecting Walker to the offense.

For these reasons, the record contains no non-accomplice evidence that tends to connect Walker to the offense.

## D.    Summary

The only non-accomplice evidence that even arguably connects Walker to the robbery are the text messages, but even if those were properly

admitted, they at most tend to connect Walker to Johnson on the morning of the robbery, which is insufficient to corroborate the testimony of the accomplices. Accordingly, the evidence is insufficient to corroborate Johnson's and Clark's accomplice testimony.

Therefore, the Court should reverse the judgment of conviction and render a judgment of acquittal. *See* TEX. R. APP. P. 43.2(c); *Malik*, 953 S.W.3d at 240 n.6; *Gaston*, 324 S.W.3d at 911; *Wincott*, 59 S.W.3d at 703.

**Second Issue:**   **The trial court abused its discretion by admitting text messages found on an accomplice's phone.**

Walker's accomplice Oliver Johnson identified a series of text messages that he claims were exchanged between Walker and himself. The messages were not properly authenticated and constituted inadmissible hearsay because the State presented no evidence connecting them to Walker's phone.

**A.   Issues of Admissibility Are Reviewed Under an Abuse-of-Discretion Standard.**

An appellate court reviews a trial court's ruling on the admissibility of evidence under an abuse-of-discretion standard. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). That decision will not be disturbed unless it lies outside the zone of reasonable disagreement. *See id.*

**B.   The Text Messages Are Inadmissible Hearsay Evidence.**

"'Hearsay' means a statement that:

> (1) the declarant does not make while testifying at the current trial or hearing; and

> (2) a party offers in evidence to prove the truth of the matter asserted in the statement."

TEX. R. EVID. 801(d).

Text messages constitute hearsay when offered for the truth of the matter asserted. *Black v. State*, 358 S.W.3d 823, 831 (Tex. App.—Fort Worth 2012, pet. ref'd).

When the State seeks to establish that the defendant sent a text message, the State must in some way connect the text message to the defendant before the statement of a party-opponent or statement against interest exception might apply. *Id.* at 832. Arguably, this is an issue of authentication. However, it is one degree removed from having the witness merely testify that the defendant verbally said something to him.

The Fort Worth Court considered a similar complaint in *Black* and concluded that, because of a lack of evidence connecting the text messages at issue to the defendant, the messages constituted inadmissible hearsay.

> Because there was no showing that Appellant wrote or ratified any of the messages, and indeed, no showing that the messages were written while the cell phone was in Appellant's possession, the messages did not qualify as statements that he made against his penal interest and therefore did not fall under that hearsay exception.

*Id.*

The same principle applies to Walker's case.

## C. The State Failed to Connect the Text Messages to Walker.

Walker's accomplice Oliver Johnson provided the only testimony connecting Walker to the text messages. However, his testimony was uncorroborated with regard to the identity of the person who sent him these messages. As previously discussed in the First Issue, the testimony of an accomplice must be corroborated. *See* TEX. CODE CRIM. PROC. art. 38.14; *Cocke v. State*, 201 S.W.3d 744, 747 (Tex. Crim. App. 2006).

Johnson himself conceded that he did not personally witness Walker sending any of the text messages. But more importantly, the State failed to perform the rather simple task of subpoenaing the records for the number that purportedly belonged to Walker and demonstrate that the phone from which these messages were received in fact was Walker's phone. *See Butler v. State*, 459 S.W.3d 595, 602-03 (Tex. Crim. App. 2015) ("For example, a cellular-phone company may provide records to show that a text message originated from the purported sender's phone 'under circumstances in which it is reasonable to believe that only the purported sender would have had access to the ... cell phone.'") (quoting *Tienda v. State*, 358 S.W.3d 633, 640 (Tex. Crim. App. 2012)).

In summary, this was a failure by the State to corroborate Johnson's testimony with regard to the identity of the sender of the text messages at issue or to authenticate that those messages were actually sent by Walker.

## D.     Walker's Testimony Did Not Waive the Error.

Walker testified in his own defense in an attempt to explain the text messages offered against him.

The general rule is that a defendant waives error if evidence to which he has objected is later offered without objection. However, waiver does not occur when the defendant offers further evidence to meet, destroy or explain the evidence to which he previously objected. *Leday v. State*, 983 S.W.2d 713, 719 (Tex. Crim. App. 1998); *McGlothlin v. State*, 896 S.W.2d 183, 189 n.9 (Tex. Crim. App. 1995); *Webster v. State*, 26 S.W.3d 717, 723 (Tex. App.—Waco 2000, pet. ref'd).

As Professors Dix and Schmolesky have explained, this exception is "designed to encourage defendants to take trial steps to minimize the impact on the trial of what those defendants believe was error by trial judges." 43A GEORGE E. DIX & JOHN M. SCHMOLESKY, TEXAS PRACTICE SERIES: CRIMINAL PRACTICE AND PROCEDURE § 53:158 (3d ed. 2011).

Therefore, Walker did not waive error by trying to explain the text messages in his testimony.

**E.  The Court Abused Its Discretion by Admitting the Text Messages.**

The text messages at issue were hearsay. *Black*, 358 S.W.3d at 831. They might fit within the hearsay exception for a statement of a party opponent (or some other exception) if they were properly connected to Walker. However, the State failed to accomplish this.

First, Johnson was an accomplice as a matter of law, so his testimony must be corroborated. TEX. CODE CRIM. PROC. art. 38.14; *Cocke*, 201 S.W.3d at 747. However, the State failed to corroborate Johnson's testimony in any respect.

Second, the State failed to offer cellphone records or other documentary evidence that would even connect the text messages to a cell phone registered to Walker. *See Butler*, 459 S.W.3d at 602-03.

Sometimes, the context of messages may sufficiently connect the messages to a particular sender. *Id.* at 603. Here, however, there is nothing in the messages themselves to connect them to Walker.

Finally, Walker's testimony offered to explain the text messages does not waive his complaint. *See Leday*, 983 S.W.2d at 719; *McGlothlin*, 896 S.W.2d at 189 n.9; *Webster*, 26 S.W.3d at 723.

For these reasons, the trial court abused its discretion by admitting the text messages.

**F.     Walker Was Harmed by This Error.**

The victim could not identify any of the robbers. The video evidence is inconclusive regarding their identity. Therefore, the State relied solely on accomplice testimony in its attempt to connect Walker to the offense. The text messages are the only evidence the State had to even arguable connect Walker to the offense. Therefore, Walker suffered harm by the erroneous admission of the text messages.

The erroneous admission of hearsay evidence is non-constitutional error subject to the harm analysis of Rule of Appellate Procedure 44.2(b). *See Brown v. State*, 189 S.W.3d 382, 388 (Tex. App.—Texarkana 2006, pet. ref'd). Such error must be disregarded unless it affects the appellant's substantial rights. TEX. R. APP. P. 44.2(b).

> [An appellate] court "will not overturn a criminal conviction for non-constitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error did not

influence the jury, or influenced the jury only slightly." In considering the potential to harm, the focus is not on whether the outcome of the trial was proper despite the error, but whether the error had a substantial or injurious effect or influence on the jury's verdict. A conviction must be reversed for non-constitutional error if the reviewing court has grave doubt that the result of the trial was free from the substantial effect of the error. "Grave doubt" means that "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." "[I]n cases of grave doubt as to harmlessness the petitioner must win."

*Barshaw v. State*, 342 S.W.3d 91, 93-94 (Tex. Crim. App. 2011) (quoting *Schutz v. State*, 63 S.W.3d 442, 444 (Tex. Crim. App. 2001); *Burnett v. State*, 88 S.W.3d 633, 637-38 (Tex. Crim. App. 2002)) (footnotes omitted) (other citations omitted); *see Brown*, 189 S.W.3d at 388; *Martinez v. State*, 188 S.W.3d 291, 293 (Tex. App.—Waco 2006, pet. ref'd).

This harm analysis is derived from the federal standard. "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win." *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S. Ct. 992, 994, 130 L.

Ed. 2d 947 (1995) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637-38, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)).[7]

Because of the total absence of other evidence tending to connect Walker to the offense, the erroneous admission of the text messages affected his substantial rights and thus caused him to suffer harm within the meaning of Rule 44.2(b).

Therefore, the Court should reverse the judgment of conviction and remand this case for a new trial. *See* TEX. R. APP. P. 43.2(d); *Brown*, 189 S.W.3d at 389; *Martinez*, 188 S.W.3d at 294.

---

[7] The original source of the internal quotation is *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946).

# Prayer

WHEREFORE, PREMISES CONSIDERED, Appellant Bronchea Gerad Walker asks the Court to: (1) reverse the judgment of conviction and render a judgment of acquittal; (2) reverse the judgment of conviction and remand this case for further proceedings; and (3) grant such other and further relief to which he may show himself justly entitled.

Respectfully submitted,

_/s/ Alan Bennett_
E. Alan Bennett
SBOT #02140700
Attorney for Appellant

Sheehy, Lovelace & Mayfield, P.C.
510 N. Valley Mills Dr., Ste. 500
Waco, Texas  76710
Telephone:          (254) 772-8022
Fax:                    (254) 772-9297
Email:        abennett@slmpc.com

## Certificate of Compliance

The undersigned hereby certifies, pursuant to Rule of Appellate Procedure 9.4(i)(3), that this computer-generated document contains 6,208 words.

*/s/ Alan Bennett*
E. Alan Bennett

## Certificate of Service

The undersigned hereby certifies that a true and correct copy of this document has been served by e-mail on December 30, 2015 to counsel for the State, Sterling Harmon at sterling.harmon@co.mclennan.tx.us.

*/s/ Alan Bennett*
E. Alan Bennett